Below is an opinion of the court.

*Teresa H. Pearson*
_____
TERESA H. PEARSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 23-62324-thp13 |
| RUSSELL LAVERGNE BALDWIN, | MEMORANDUM OF DECISION[1] |
| Debtor. | |

      This case came before the court on confirmation of debtor Russell Lavergne Baldwin's Second Amended Chapter 13 Plan dated 06/17/2024.[2]  Chapter 13 trustee Naliko Markel objected to confirmation and moved to dismiss the case (ECF No. 43).[3]  Creditors Kent Seida, Jr., Dave Seida, Suzanne Seida, Seida Land & Livestock, LLC, Kent Seida, Sr., and Mary Seida (collectively the "Seida Creditors") also objected to confirmation and moved to dismiss the case with a bar to refiling of at least 180 days.[4]

      The court held an evidentiary hearing on August 19 and 20, 2024.  Mr. Baldwin appeared through his counsel Alan G. Seligson, the Seida Creditors appeared through their counsel Cassie K. Jones, and the chapter 13 trustee appeared on his own behalf.  At the end of the

---

[1] This disposition is specific to this case.  It may be cited for whatever persuasive value it may have.
[2] ECF No. 41.
[3] ECF No. 43.
[4] ECF No. 44.

hearing, the chapter 13 trustee and the Seida Creditors orally moved to convert the case to chapter 7, rather than to dismiss it.

After considering the testimony presented and exhibits admitted into evidence, and the records and files of this case, the court makes findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this case by Fed. R. Bankr. P. 7052 and 9014(c). For the reasons set forth below, the court will convert this case to chapter 7.

## Findings of Fact

1.       Mr. Baldwin filed his voluntary petition under chapter 13 on December 13, 2023.[5] On January 5, 2024, Mr. Baldwin filed his schedules and statement of financial affairs.[6]

### Mr. Baldwin's Income

2.       On Schedule I[7] and Exhibit D-2,[8] Mr. Baldwin reported a monthly net income of $1,000 from operating a legal services business. Mr. Baldwin also reported on Schedule I that he had a $1,500 monthly income from disability insurance. However, Mr. Baldwin did not have monthly income from disability insurance when the case was filed—Mr. Baldwin's claims for disability insurance were denied in August 2022 and again in March 2023. Although Mr. Baldwin was continuing to seek payment of disability insurance benefits, the disability insurance, if granted, was anticipated to be only $1,100 to $1,200 monthly, and not the previously claimed $1,500 monthly. Mr. Baldwin did not disclose any other sources of income on this original Schedule I.

3.       On March 12, 2024, Mr. Baldwin amended his Schedule I.[9] He continued to report a monthly net income of $1,000 from operating a legal services business, a $1,500 monthly income from disability insurance, and no other sources of income. He amended the schedule to indicate that he anticipated an increase in his income within the year, specifically saying "Private disability insurance in process of retroactive approval to 8/2021 should be

---

[5] ECF No. 1.
[6] ECF No. 17 and 18.
[7] ECF No. 17.
[8] ECF No. 18. Exhibit D-2 is a financial review of debtor's non-farming/non-fishing business.
[9] ECF No. 29.

received soon including a lump sum to help fund the Plan. Partial self-employment income should also increase over the next year. Non-filing spouse's retirement savings will otherwise be used as needed to fund the Plan."[10] At the time, the disability insurance claim had not been approved.

4.       At the end of June 2024, the disability insurer denied Mr. Baldwin's disability insurance claim for the third time. Debtor did not disclose this information to the chapter 13 trustee or the Seida Creditors until July 29, 2024.[11]

5.       On August 18, 2024, the day before the confirmation hearing, Mr. Baldwin filed a second amended Schedule I.[12] Mr. Baldwin removed the $1,500 monthly income from disability insurance. Mr. Baldwin increased his reported monthly net income from operating a legal services business to $2,650 and indicated that his non-filing spouse would make a $720 monthly contribution to his income. Mr. Baldwin did not amend his prior Exhibit D-2, but instead submitted an attachment to the second amended Schedule I stating that his estimated monthly gross business income would be $3,000, and his estimated monthly business expenses would be only $350. He amended the schedule to state he anticipated an increase in his income within the year, specifically saying, "Debtor will increase business income and/or non-filing spouse's financial contributions in order to make any necessary increased Plan payments, will continue to pursue his retroactive disability claim and, if necessary, start drawing social security of at least $1,200/month in January 2025."[13]

6.       At trial, Mr. Baldwin admitted that his estimated monthly business expenses included only the cost of mandatory bar dues and professional liability insurance. Yet, Mr. Baldwin acknowledged that he needs a bookkeeper for his legal practice (or at a minimum, bookkeeping software such as QuickBooks), but did not include that expense in his budget. In addition, he admitted he would likely have other business expenses for his law practice, but could quantify only an additional $40 monthly charge for access to the state court electronic

---

[10] ECF No. 29.
[11] Exh. 15, p.1.
[12] ECF No. 55.
[13] ECF No. 55.

court filing system and $150 every three years for required continuing legal education. Instead of accounting for these additional expenses, Mr. Baldwin asserted at trial that his wife (a non-debtor) would likely pay his other business expenses and assist with his bookkeeping, at least for a while.

7.     For her part, Mr. Baldwin's wife testified that she is willing to contribute whatever funds she needs to contribute to ensure the success of Mr. Baldwin's plan. Although she vaguely described her various accounts as containing a "couple hundred thousand dollars, give or take," she also acknowledged that she had her own separate financial obligations, including some relating to her underinsured former residence, which burned down. Mr. Baldwin's wife did not specifically quantify the resources she was willing or able to contribute to Mr. Baldwin's plan, other than agreeing to make the $720 monthly contribution identified in the Amended Schedule I filed the day before the confirmation hearing.

### Mr. Baldwin's Assets

8.     On Schedule A/B, Mr. Baldwin listed various assets.[14] Of significance, Mr. Baldwin owns two parcels of real property. The first was his home, which he valued at $250,000. The second was a bare lot next door to his home that he owned in joint tenancy, in which he valued his interest at $11,500. On Schedule C, Mr. Baldwin asserted a $40,000 exemption on his home and a $346 exemption on the bare lot.

9.     Mr. Baldwin fully exempted his remaining assets on Schedule C,[15] including a car, household goods, electronics, firearms, clothing, bank accounts, and retirement accounts. These included the "net proceeds of cashed out inherited IRA check"[16] held in debtor's attorney's trust account.

10.    In response to the question on Schedule A/B asking if "you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died," Mr. Baldwin answered "No."[17] In describing the bare lot

---

[14] ECF No. 17.
[15] ECF No. 17.
[16] ECF No. 17.
[17] ECF No. 17.

that he owned as a joint tenant, Mr. Baldwin stated that the lot was owned 2/3 by the estate of his deceased mother, "in which debtor has no known interest."[18]

11.     On Schedule A/B, Mr. Baldwin also described owning six different legal claims (including the claim for disability insurance), all valued at an unknown amount.  At trial, Mr. Baldwin acknowledged that some of these claims had been denied already and were on appeal, and he had not yet pursued others.  He testified he had not pursued the tort claims because he was unable to find a lawyer who would take them on a contingency fee, and he had not pursued the collection claim because the obligor was "destitute."

12.     On June 17, 2024, Mr. Baldwin amended his Schedule A/B.[19]  In response to the question asking if debtor had any trusts, equitable or future interests in property, he stated that he had a "1/3 share, minus $99,436 advance, under unprobated Will of father, Donald E. Baldwin, deceased 4/11/20, including 2/3 ownership of lot next door to Debtor's residence at 5955 Balboa Ave (estimated net share after liquidation and probate expense)."[20]  Mr. Baldwin valued this interest at $78,000, but at trial could not explain how he came up with that value.

13.     Mr. Baldwin also amended the information describing his interest in the bare lot to state: "Bare lot next door to 5955 Balboa Ave residence (total value $35,000; 2/3 owned by estate of deceased mother, Evelyn Baldwin, now part of estate of deceased father, Donald Baldwin, in which debtor has a 1/3 interest)."[21]  In this amended schedule, Mr. Baldwin did not adjust the value of his interest in the property, which remained at $11,500.

14.     Mr. Baldwin also disclosed in this amendment that the disability insurance payments were "potentially due at $1,180/mo from November 2021, currently under review (up to $28,100)."[22]  Mr. Baldwin amended his Schedule C to exempt the disability insurance payments fully.

---

[18] ECF No. 17.
[19] ECF No. 42.
[20] ECF No. 42.
[21] ECF No. 42.
[22] ECF No. 42.

15.     At trial, Mr. Baldwin disclosed that he was entitled to receive a payment of $2,000 from the Oregon state court.  He admitted that he had received a check for that amount but not cashed it, and the check later burned up in a fire.  Mr. Baldwin stated he did not want to cash the check, because he was concerned that under the judgment benefit doctrine, he would be giving up rights on his multiple appeals of claims related to the Seida Creditors if he did so.  Nonetheless, there is a state court order granting Mr. Baldwin a legal right to $2,000.  This asset was never disclosed on any of Mr. Baldwin's schedules.

16.     It is undisputed that Mr. Baldwin's home suffers from significant deferred maintenance.  Among other problems, there are cracks in the foundation and the home needs a new roof.  Because of the home's condition, the home would not qualify for conventional financing.

17.     Mr. Baldwin has received quotes for foundation repair from Terra Firma Foundation Systems ranging from $49,713.48 to $75,256.62.  Mr. Baldwin has received a quote from Saw & Paw, an experienced residential contractor with a focus on energy efficiency, to perform roof repair and other maintenance work for $74,105.94.  This contractor testified the amount would need to be increased to account for additional concerns he saw after visiting the property.  Mr. Baldwin and his wife testified they believe that they can do some of the work necessary on the house themselves but acknowledge they cannot do it all.

18.     At trial, the parties disputed the value of Mr. Baldwin's home and the bare lot. The Seida Creditors presented the testimony and appraisals of Ric W. Becker, a certified residential real estate appraiser with 36 years of experience, who focuses his practice on Lincoln and Tillamook Counties in Oregon.  Mr. Baldwin presented the testimony and conclusions of Loren L. Leach, a realtor who has worked in Lincoln County for more than 25 years. Mr. Baldwin himself also testified as an owner regarding his opinion of value.

19.     The court finds Mr. Becker's conclusions as to the value of the home and the bare lot to be most persuasive.  In his appraisal of the home, Mr. Becker took account of the problems with the house, included other "fixers" as among the comparable sales, and made appropriate adjustments.  The appraisal report for the home states that "[t]his appraisal report is being made

'As Is' with all observed deferred maintenance and need for repairs reflected in the value opinion itself."[23]

20.     The court concludes that the value of Mr. Baldwin's home on the petition date was $320,000, and the value of the bare lot was $100,000.  The court further concludes that the value of Mr. Baldwin's interest in the bare lot on the petition date is $55,555.55 (the sum of Mr. Baldwin's 1/3 interest valued at $33,333.33 and his right to receive 1/3 of the remaining $66,666.67 in value previously held by Mr. Baldwin's deceased mother and now subject to various probate proceedings).

**Mr. Baldwin's Liabilities**

21.     Wells Fargo Bank, N.A., filed a secured claim, asserting a security interest against Mr. Baldwin's home based on a deed of trust recorded on August 31, 2009.[24]  Wells Fargo asserts the amount of the claim is $90,398.03, and the amount necessary to cure any default as of the date of the petition is $2,424.39.

22.     The Seida Creditors filed secured claims asserting a security interest on Mr. Baldwin's real property based on judgment liens arising from the following judgments:

a.     Judgment No. 1:[25]  A supplemental limited judgment and money award entered June 23, 2017, in the principal amount of $9,063.00, against Mr. Baldwin and in favor of judgment creditors Suzanne Seida, David M. Seida, and Kent Seida, Jr., together with post-judgment interest accruing at the rate of 9% per annum from the date of entry of judgment until fully paid.  The judgment creditors assert that the amount of interest due as of the petition date is $5,282.86, for a total amount due of $14,345.86.[26]

b.     Judgment No. 2:[27]  A supplemental limited judgment and money award entered June 26, 2017, in the principal amount of $62,608.63, in favor of judgment creditors

---

[23] Exh. 2, p. 4.
[24] Proof of claim no. 3.
[25] Exh. 19.
[26] Proof of claim no. 4.
[27] Exh. 20.

Suzanne Seida, David M. Seida, and Kent Seida, Jr., together with post-judgment interest accruing at the rate of 9% per annum from the date of entry of judgment until fully paid. The judgment creditors assert that the amount of interest due as of the petition date is $36,448.51, for a total amount due of $99,057.14.[28]

c. Judgment No. 3:[29] A supplemental limited judgment and money award entered March 6, 2018, in the principal amount of $92,802.73, in favor of judgment creditors Mary Seida and Kent Seida, Sr., together with post-judgment interest accruing at the rate of 9% per annum from the date of entry of judgment until fully paid. The judgment creditors assert that the amount of interest due as of the petition date is $48,008.25, for a total amount due of $140,810.98.[30]

d. Judgment No. 4:[31] A supplemental general judgment and money award entered March 6, 2018, in the principal amount of $104,552.79, in favor of judgment creditor Seida Land and Livestock, LLC, together with post-judgment interest accruing at the rate of 9% per annum from the date of entry of judgment until fully paid. The judgment creditors assert that the amount of interest due as of the petition date is $38,506.20, for a total amount due of $143,058.99.[32]

e. Judgment No. 5: An amended appellate judgment and supplemental judgment with an effective date of February 22, 2023, *nunc pro tunc* to March 22, 2022, and entered March 28, 2022, in the principal amount of $80,269.50, in favor of judgment creditors Kent Seida, Jr., Seida Land & Livestock, LLC, Kent Seida, Sr., David M. Seida, Mary Seida, and Suzanne Seida, together with post-judgment interest accruing at the rate of 9% per annum from the date of the appellate judgment until fully paid. The

---

[28] Proof of claim no. 4.
[29] Exh. 21.
[30] Proof of claim no. 5.
[31] Exh. 22.
[32] Proof of claim no. 6.

judgment creditors assert that the amount of interest due as of the petition date is $12,370.30, for a total amount due of $92,639.80.[33]

Mr. Baldwin asserts in the Second Amended Plan that these judgments are all *void ab initio* but does not challenge the amounts of the claims if the judgments were valid.[34]

23.     The Department of Treasury, Internal Revenue Service filed a claim in the amount of $20,238.41, asserting that $4,250.00 is secured by right of setoff, and $15,988.41 is unsecured.[35]  The proof of claim does not indicate that a tax lien has been recorded against Mr. Baldwin's real property (the "Lien Filed: Office Location" column on the Form 410 Attachment is left blank for this amount).

24.     Discovery Bank filed an unsecured claim for $10,857.70 for credit card debt.[36]

25.     The Oregon Department of Revenue filed a claim asserting it is owed $0.00.[37]

26.     No other proofs of claim have been filed.

27.     Other than his informal objections to the claims of the Seida Creditors in the Second Amended Plan, Mr. Baldwin has not objected to these proofs of claim, so the claims are deemed allowed under 11 U.S.C. § 502(a).

### Mr. Baldwin's Plans

28.     Mr. Baldwin filed his initial Plan on January 5, 2024.[38]  After objections were filed, Mr. Baldwin asked for confirmation to be denied and 28 days' leave to file an amended plan, which was granted.[39]

29.     Mr. Baldwin filed his First Amended Chapter 13 Plan dated March 12, 2024, on March 13, 2024.[40]  The court held a preliminary hearing on the First Amended Plan on April 16, 2024.  At that hearing, the court scheduled a final evidentiary hearing on the First Amended Plan

---

[33] Proof of claim no. 7.
[34] Second Amended Plan dated June 17, 2024, ECF No. 41, ¶ 16.
[35] Proof of claim no. 2.
[36] Proof of claim no. 1.
[37] Proof of claim no. 8.
[38] ECF No. 14.
[39] ECF Nos. 24-25.
[40] ECF No. 32.

for June 17, 2024.[41]  After the chapter 13 trustee and the Seida Creditors learned that Mr. Baldwin was entitled to an inheritance from his father, they and Mr. Baldwin filed a stipulated motion to postpose the confirmation hearing so that Mr. Baldwin could file a new plan that would take the inheritance into account.[42]  The court granted the motion and ordered Mr. Baldwin to file his amended plan and amended schedules by no later than June 17, 2024.[43]

30.     In his Second Amended Plan, Mr. Baldwin proposes to make payments for approximately 60 months, even though his applicable commitment period is 36 months.[44]  He proposes to make four monthly payments of $230, 14 monthly payments of $1,100, and the remaining monthly payments of $1,300.  This is a total monthly plan payment of $70,920.  The plan payments will be applied to payment of secured claims, priority claims, administrative expenses (trustee's fees and attorney fees), and unsecured claims.  Unsecured creditors are anticipated to receive approximately 14% of their claims.

31.     In paragraph 4(b)(1) of the Second Amended Plan, Mr. Baldwin proposes to pay the Internal Revenue Service as a secured creditor, listing its claim of $4,250 under the heading "Estimated Secured Claim if Paying in Full."  The collateral listed for this claim is Mr. Baldwin's home.  Mr. Baldwin proposes to pay the Internal Revenue Service $165.00 per month starting in month 19 of the Plan.

32.     In paragraph 4(b)(1) of the Second Amended Plan, Mr. Baldwin proposes to pay Wells Fargo Bank as a secured creditor, listing its claim of $2,424.39 under the heading "Estimated Secured Claim if Paying in Full."  At trial, Mr. Baldwin's counsel acknowledged this was a clerical error, and the amount of $2,424.39 should have been listed under the heading "Estimated Arrearage if Curing."  The collateral listed for this claim is Mr. Baldwin's home. Mr. Baldwin proposes to pay Wells Fargo all available funds, pro rata, after attorney fees and the Internal Revenue Service are paid in full.  Under paragraph 7 of the Second Amended Plan, Mr. Baldwin proposes to pay Wells Fargo Bank its regular post-petition payments directly.

[41] ECF No. 38.
[42] ECF No. 39.
[43] ECF No. 40.
[44] ECF No. 41.

33.    Mr. Baldwin proposes treatment of the Seida Creditors in paragraphs 4(b)(1), 6, and 16 of the Second Amended Plan.  Mr. Baldwin proposes to continue his appeals of the judgments obtained by the Seida Creditors, and "[i]n the event the Seida judgments are ultimately deemed valid" proposes to (a) pay on account of Judgment Nos. 1 and 2, with 9% interest, $600 per month starting in month five, and all available funds pro rata after attorney fees and the senior claim of the Internal Revenue Service are paid in full; (b) pay on account of Judgment No. 3, with 9% interest, $65 per month starting in month five, and all available funds pro rata after attorney fees and the senior claim of the Internal Revenue Service are paid in full, and avoid the judgment lien of all but $13,103 of Judgment No. 3 pursuant to 11 U.S.C. §522(f)(1); and (c) avoid all of the judgment liens of Judgment Nos. 4 and 5 pursuant to 11 U.S.C. §522(f)(1).

34.    With respect to Mr. Baldwin's anticipated inheritance from his father's estate, in paragraph 4(h) of the Second Amended Plan, Mr. Baldwin proposes that the "best interest of creditors" number is $71,000, and not less than $71,000 must be distributed to unsecured priority and nonpriority creditors.

35.    With respect to Mr. Baldwin's various legal claims, in paragraph 15 of the Second Amended Plan, Mr. Baldwin proposes to pay any non-exempt proceeds from those claims into the Plan and increase the "best interest" number accordingly.

36.    Paragraph 17 of the Second Amended Plan provides that if the proposed payments are insufficient to pay all required claims in full, Mr. Baldwin will sell or refinance his real property no later than June 30, 2028, and pay the trustee from the proceeds at closing funds sufficient to pay all creditors with a security interest in the real property, and funds sufficient to ensure the feasibility of the Plan.

37.    Mr. Baldwin testified that he has a close friend that he believes would be willing to lend him the money to refinance his home, if necessary, but refused to disclose the identity of this potential lender at trial.

38.    Mr. Baldwin was current on his Plan payments as of the time of the hearing on confirmation of the Plan.

**Other Relevant Facts**

39. Mr. Baldwin originally drafted his parents' wills. As he drafted them, the wills were reciprocal wills: his parents first left their assets to each other, and then, after the second parent passed, left their assets to their three sons in equal shares. Mr. Baldwin's mother died in 2010. After she died, her estate was not probated, and Mr. Baldwin understood that her assets went to Mr. Baldwin's father.

40. Sometime after Mr. Baldwin's mother died, Mr. Baldwin's father went to another lawyer to revise his will. As revised, Mr. Baldwin's father's will continued to state that Mr. Baldwin and his two brothers would share in assets equally, except Mr. Baldwin's share would be reduced by $99,436 to account for funds Mr. Baldwin's parents had already provided to or on behalf of Mr. Baldwin during their lifetimes. Mr. Baldwin's father died in 2020.

41. Mr. Baldwin asserts that he did not know the terms of his father's new will until the will was provided to Mr. Baldwin's bankruptcy counsel postpetition.[45] Under the circumstances, Mr. Baldwin was at least on inquiry notice that he might be entitled to some portion of his father's estate. Mr. Baldwin asserts he did not inquire. The court does not find Mr. Baldwin's assertions credible, particularly because Mr. Baldwin received distributions from his father's pension in 2022 and an inherited IRA account in 2023 (before bankruptcy) after his father died.

42. A petition for probate of Mr. Baldwin's father's will was filed in Washington County Circuit Court on June 4, 2024, by Mr. Baldwin's older brother. The petition describes assets of the probate estate with an approximate value of $706,000, and approximate indebtedness and taxes due of $0.

43. Mr. Baldwin suffers from medical conditions that affect his executive function and ability to organize data. Although Mr. Baldwin's medical condition has been improving, his

---

[45] Despite requests, Mr. Baldwin's bankruptcy counsel did not provide a copy of Mr. Baldwin's father's will to the Seida Creditors until shortly after the Seida Creditor's counsel provided notice to Mr. Baldwin's counsel of third-party document subpoenas to be served on Mr. Baldwin's brothers to obtain a copy of the will. Exh. 10.

wife has his power of attorney and handles many tasks for him. Mr. Baldwin's wife has handled his disability insurance claim. Mr. Baldwin is unable to write checks, so his wife pays the bills.

44.     Mr. Baldwin's wife (who has a doctorate in holistic medicine) believes Mr. Baldwin is able to work part time as an attorney a few days a week. She serves as his legal assistant. Mr. Baldwin believes he can prepare wills and trusts but does not wish to take on litigation matters that would require him to be in court.

45.     Mr. Baldwin filed his tax returns for 2022 but does not recall when. Mr. Baldwin acknowledges that his 2022 tax returns are inaccurate and need to be amended. Mr. Baldwin has not filed his tax return for 2023. Mr. Baldwin has attempted to complete these tax returns, but because of his medical condition has been unable to do so.

**<u>Conclusions of Law</u>**

**A.  Amounts and Status of Secured Claims Against Debtor's Real Property**

Although the Internal Revenue Service has asserted a secured claim in Mr. Baldwin's real estate, under this record it does not appear to have filed notice of its lien as required by 26 U.S.C. § 6323(f)(1)(A). This security interest is not valid as against judgment lien creditors in the real estate. 26 U.S.C. 6323(a).[46]

The security interests against Mr. Baldwin's home and bare lot as of the petition date, applying the total value of the property as $375,555.55, and after taking account of Mr. Baldwin's $40,000 homestead exemption and $346 exemption on the bare lot, are as follows:[47]

---

[46] The Internal Revenue Service is still entitled to payment as a secured creditor in this case because it has a secured claim based on a right of setoff.

[47] The record contains no information indicating any property taxes were due as of the petition date for either Mr. Baldwin's home or the bare lot.

| Lien Position | Creditor Name | Amount | Status |
|---|---|---|---|
| 1 | Wells Fargo Bank | $90,398.03 | Fully secured |
| 2 | Seida Creditors Judgment No. 1 | $14,345.86 | Fully secured |
| 3 | Seida Creditors Judgment No. 2 | $99,057.14 | Fully secured |
| 4 | Seida Creditors Judgment No. 3 | $140,810.98 | $131,408.52 is secured, $9,402.46 is unsecured |

The remaining judgments of the Seida Creditors, Judgment No. 4 in the amount of $143,058.99 and Judgment No. 5 in the amount of $92,639.80, are unsecured.

### B. Eligibility

Under the Bankruptcy Code, "[o]nly an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated debts of less than $2,750,000 . . . may be a debtor under chapter 13 of this title."[48] The Code defines the term 'individual with regular income' to mean an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stockbroker or a commodity broker."[49]

At the time that Mr. Baldwin filed this case, he had recently restarted his law practice part time, after his medical conditions improved and he did some work as a consultant. The evidence shows that, since restarting his law practice, Mr. Baldwin has had income almost every month from that work. Mr. Baldwin is also current on his plan payments. Under the specific facts of this case, the court holds that Mr. Baldwin was eligible to file chapter 13.[50]

### C. Good Faith

As a condition of plan confirmation, the court is required to find that "the plan has been proposed in good faith and not by any means forbidden by law" under Section 1325(a)(3) and

---

[48] 11 U.S.C. § 109(e).
[49] 11 U.S.C. § 101(30).
[50] Eligibility to file chapter 13 is a separate question from feasibility of a plan, which is addressed below.

"the action of the debtor in filing the petition was in good faith" under Section 1325(a)(7). Based on the record, and the findings of fact set forth above, the court cannot make this finding.

The Ninth Circuit Court of Appeals requires the court to consider the totality of the circumstances to determine good faith. The court should consider several factors, including (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his chapter 13 petition or plan in an inequitable manner, (2) the debtor's history of filings and dismissals, (3) whether the debtor only intended to defeat state court litigation, and (4) whether egregious behavior is present. The court is not required to find fraudulent intent by the debtor.[51]

With respect to the first factor, Mr. Baldwin misrepresented facts in his bankruptcy schedules and statement of financial affairs. He did not accurately disclose information regarding his claims for disability insurance, his rights to receive an inheritance from his father, or the expenses for his business. Although he eventually amended some of his schedules to address these deficiencies, he only did so after the chapter 13 trustee and the Seida Creditors repeatedly pushed the issues. Some of the deficiencies remain unresolved. This factor weighs against good faith.

With respect to the second factor, Mr. Baldwin has no prior history of filing bankruptcy. This factor weighs in favor of good faith.

With respect to the third factor, Mr. Baldwin filed this case only to defeat state court litigation. Mr. Baldwin conceded at the meeting of creditors that the sole reason he filed bankruptcy was to obtain an automatic stay against collection efforts by the Seida Creditors.[52] Mr. Baldwin argues that many creditors file bankruptcy to stop foreclosures or other collection activity, and that this factor alone does not indicate bad faith. That is true. However, there is a difference between filing bankruptcy to address many debt problems in one organized forum

---

[51] *Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 851 (9th Cir. BAP 2012), *aff'd*, 711 F.3d 1120, 1127-30 (9th Cir. 2013) (good faith in confirmation of a plan); *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1224 (9th Cir. 1999) (good faith in filing chapter 13 petition).
[52] Exh. 9.

versus filing bankruptcy merely to stall or delay one small group of creditors. In this case, Mr. Baldwin was current or nearly current on his mortgage when he filed. He had one credit card and one tax claim. In addition, his other creditors were not actively pursuing collection. Mr. Baldwin clearly filed this case to gain advantage over the Seida Creditors. This factor weighs against good faith.

With respect to the fourth factor, Mr. Baldwin asserts in his plan that his intent is to continue his efforts to appeal and to void the judgments of the Seida Creditors.[53] However, Mr. Baldwin has already appealed those judgments and has not prevailed. The U.S. Supreme Court has already denied certiorari on his appeal. The Seida Creditors' judgments are final. This court must recognize the validity of those judgments because this court must give full faith and credit to final judgments of a state court.[54] To the extent that Mr. Baldwin asks this court to do otherwise, his request is egregious. This factor also weighs against good faith.

After considering the totality of the circumstances, the court cannot find good faith in this case.

### D. Requirements for Plan Confirmation

"For a court to confirm a plan, each of the requirements of section 1325 must be present and the debtor has the burden of proving that each element has been met."[55] Mr. Baldwin has not met his burden of proving that all the requirements of section 1325 are satisfied.

### a. Best Interest Test

Section 1325(a)(4) provides as a condition of plan confirmation the court must find that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date."

---

[53] Despite making this assertion, Mr. Baldwin has taken no steps since the bankruptcy case was filed to continue his appellate efforts against the Seida Creditors. It is not clear that Mr. Baldwin has any remaining appellate avenues to pursue.
[54] 28 U.S.C. § 1738.
[55] *Chinichian v. Campolongo, (In re Chinichian)*, 784 F.2d 1440, 1443-44 (9th Cir. 1986).

In the Second Amended Plan, Mr. Baldwin proposes that the "best interest of creditors" number is $71,000, and not less than that amount must be distributed to unsecured priority and nonpriority creditors. Mr. Baldwin's primary non-exempt, unencumbered assets are his rights to receive an inheritance and his litigation claims. Mr. Baldwin has failed to prove the value of those assets. Mr. Baldwin values his right to receive an inheritance in his most recent amendment to Schedule A/B at $78,000 but could not explain how he reached that figure. Even if that figure were accurate (and on this record there is no way to know if it is), Mr. Baldwin's plan does not propose to pay that much to unsecured priority and nonpriority creditors. While it is unclear if Mr. Baldwin's legal claims have any value, the court is also unable to determine that those claims have no value.

Mr. Baldwin has not satisfied the requirements of Section 1325(a)(4).

### b. Treatment of Secured Claims

Section 1325(a)(5) provides as a condition of plan confirmation the court must find that allowed secured claims receive the following treatment:

(A) the holder of such claim has accepted the plan;

(B)

> (i) the plan provides that—
>
>> (I) the holder of such claim retain the lien securing such claim until the earlier of—
>>
>>> (aa) the payment of the underlying debt determined under nonbankruptcy law; or
>>>
>>> (bb) discharge under section 1328; and
>>
>> (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;
>
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
>
> (iii) if—

> > (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
>
> > (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or
>
> (C) the debtor surrenders the property securing such claim to such holder[.]

The Seida Creditors do not consent to the proposed treatment of their claims[56] and Mr. Baldwin does not propose to surrender his home or the bare lot. That means Mr. Baldwin must satisfy the requirements of § 1325(a)(5)(B). He has not.

First, Mr. Baldwin has not met the requirements of Section 1325(a)(5)(B)(i). Although the Second Amended Plan provides the Seida Creditors will retain a lien for their Judgments No. 1 and 2, it provides that they will retain a lien for their Judgment No. 3 only in the amount of $13,103, and that the remainder of the lien for Judgment No. 3 will be avoided. To comply with the Bankruptcy Code, the Seida Creditors are entitled to retain a lien for Judgment No. 3 in the secured amount of $131,408.52.

Second, Mr. Baldwin has not met the requirements of Section 1325(a)(5)(B)(ii). Under the Plan, Mr. Baldwin proposes to pay monthly payments totaling $70,920.[57] These monthly payments would be used to pay administrative expenses, the Seida Creditors, other secured creditors, and unsecured creditors. This amount is insufficient to make all the required payments under the Plan—the Plan requires Mr. Baldwin pay at least $71,000 to the unsecured priority and nonpriority creditors alone, and the Seida Creditors' total secured claim is $244,811.52. Apparently anticipating this deficiency, the Second Amended Plan provides that if the plan payments amounts are insufficient to pay all required claims in full, Mr. Baldwin will sell or refinance his real property, and use a sufficient amount from closing to pay all secured creditors.

---

[56] ECF No. 44, p. 6, ln. 2.

[57] Mr. Baldwin also proposes to pay into the plan all non-exempt recoveries from his inheritance and his litigation claims, but as noted above, the court is unable to determine if those have any value, and for purposes of this analysis, ascribes them no value. Even if Mr. Baldwin's inheritance were worth $78,000, and that additional amount were paid into the plan, it would still not be enough to make all the required payments under the plan.

At trial, although Mr. Baldwin and his wife testified that they might be able to make some repairs to Mr. Baldwin's home, Mr. Baldwin did not establish the value for which he thought he could sell his real property by June 30, 2028, or the amount that he thought he could obtain from a refinance by that date. Given the condition of Mr. Baldwin's home, and the inability to refinance the home through conventional means, this is a significant omission. Mr. Baldwin has not proven how the Seida Creditors will receive the value, as of the effective date of the Plan, of their allowed secured claims.

Third, Mr. Baldwin has not met the requirements of Section 1325(a)(5)(B)(iii). Mr. Baldwin does not propose to make equal monthly payments to the Seida Creditors. He proposes to make monthly payments that will increase after other creditors are paid, and a balloon payment from a sale or refinance. In a case where a secured creditor objects, a balloon payment after smaller monthly payments does not comply with the requirements of Section 1325(a)(5)(B)(iii)(I).[58]

Mr. Baldwin has not satisfied the requirements of Section 1325(a)(5).

### c. Feasibility

Section 1325(a)(6) provides as a condition of plan confirmation the court must find that "the debtor will be able to make all payments under the plan and to comply with the plan." Based on the record, and the findings of fact set forth above, the court cannot make this finding about the Second Amended Plan.

First, Mr. Baldwin has not proven that he will have sufficient income over the next five years to fund both his reasonably necessary living expenses and the payments required by the Second Amended Plan. The combined monthly living expenses for Mr. Baldwin and his wife on Mr. Baldwin's most recent Schedule J are $4,031.[59] Mr. Baldwin's wife has income of $1,761

---

[58] *In re Bollinger*, No. BR 10-62344-fra13, 2011 WL 3882275 (Bankr. D. Or. Sept. 2, 2011); *In re Holifield*, No. 13-63536-fra12, 2014 WL 948828, *1, n. 3 (Bankr. D. Or. March 12, 2014). As Judge Alley noted in footnote 5 in *Bollinger*, "Section 1325(a)(5)(A) allows for payment by any means or schedule if the secured creditor accepts the plan."
[59] ECF No. 55.

monthly from Social Security and has committed to contribute an additional $720 per month to plan payments. Although Mr. Baldwin's wife indicated at trial that she was willing to pay more if necessary, Mr. Baldwin failed to establish how much that would be.

The remaining monthly living expenses and plan payments will be paid from Mr. Baldwin's earnings from his legal practice. On this record, the court cannot determine how much net income Mr. Baldwin is likely to make from his law practice. Mr. Baldwin restarted his legal practice shortly before he filed bankruptcy. He has a small number of clients, all obtained by word of mouth. Mr. Baldwin does not intend to advertise. Because of his medical conditions, Mr. Baldwin wants to change the focus of his practice to estate planning, and not take matters that will require him to appear in court. It is unclear how many clients he can obtain under these conditions in the future, and how much work his medical condition (albeit improving) will allow him to do. Mr. Baldwin also has not provided sufficient information to describe and quantify all the expenses he is reasonably likely to incur in his legal practice.

Mr. Baldwin asserts in his amended Schedule J that he will continue to pursue his disability claim.[60] However, the evidence showed that Mr. Baldwin's wife is the one who is pursuing the insurance claim on his behalf under his power of attorney. The claim has been denied three times. Mr. Baldwin's wife has never even seen the disability insurance policy. She asserted that she would still pursue the claim, but admitted she would take her own time to do so, because she has other matters of her own to handle.

Mr. Baldwin also asserts in his amended Schedule J that he will start drawing his own Social Security of at least $1,200 a month in January 2025.[61] Mr. Baldwin presented no evidence about this potential source of income at trial, and the court gives it no weight.

The fact that Mr. Baldwin is current on his plan payments, while helpful, does not change this analysis. The Second Amended Plan proposes monthly plan payments that will increase

---

[60] ECF No. 55.
[61] ECF No. 55.

over time.  Mr. Baldwin's ability to make the initial, smaller payments does not prove that he can make the later, larger payments.

Second, Mr. Baldwin has not proven that he can sell or refinance his home.  There is no dispute that Mr. Baldwin's home suffers from significant deferred maintenance and would not qualify for a conventional refinance.  As Mr. Baldwin's own realtor witness testified, this significantly limits the market of potential buyers for the property.  Mr. Baldwin's testimony about a potential friendly lender that he refused to identify was not credible or sufficient to find a refinance would be feasible.

Mr. Baldwin has not satisfied the requirements of Section 1325(a)(6).

### E.  Tax Returns

Section 1325(a)(9) provides as a condition of plan confirmation the court must find that "the debtor has filed all applicable Federal, State, and local tax returns as required by section 1308."  Section 1308(a) provides that "[n]ot later than the day before the date on which the meeting of the creditors is first scheduled to be held under section 341(a), if the debtor was required to file a tax return under applicable nonbankruptcy law, the debtor shall file with appropriate tax authorities all tax returns for all taxable periods ending during the 4-year period ending on the date of the filing of the petition."  Mr. Baldwin does not argue, and the docket does not show, that this deadline was extended pursuant to Section 1308(b).  The first scheduled date for the meeting of creditors was January 18, 2024.

Mr. Baldwin concedes that he is required to file tax returns.  Although Mr. Baldwin has filed an income tax return for 2022, he did not establish when it was filed, and admits that it is inaccurate and needs to be amended.

Mr. Baldwin has not satisfied the requirements of Section 1325(a)(9).

### F.  Conversion or Dismissal

Section 1307(c) provides that "on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best

interests of creditors and the estate, for cause." In their objections to the Second Amended Plan, the Seida Creditors sought dismissal of the case with a 180-day bar to refiling. In his objection to the Second Amended Plan, the chapter 13 trustee also moved for an order dismissing the case. At the confirmation hearing, both the Seida Creditors and the chapter 13 trustee orally moved to convert the case rather than to dismiss it.

The court must first identify if cause for dismissal or conversion exists. Section 1307(c) lists eleven non-exclusive grounds that may constitute cause for dismissal or conversion. Cause includes "unreasonable delay by the debtor that is prejudicial to creditors."[62] "A debtor's unjustified failure to expeditiously accomplish any task required either to propose or to confirm a chapter 13 plan may constitute cause for dismissal under § 1307(c)(1)."[63] Although not explicitly mentioned, bad faith is also cause for dismissal.[64]

In this case, there is cause to dismiss or convert this case. Mr. Baldwin filed this case in bad faith, to hinder and delay the Seida Creditors' collection efforts. Mr. Baldwin has not provided timely and accurate information about the status of his disability insurance claim, his right to receive an inheritance, the financial information for his law practice, and the value of his legal claims. Mr. Baldwin has failed to provide his tax returns timely to the chapter 13 trustee, has not amended his 2022 tax return (which he acknowledges must be done), and has not yet filed his 2023 tax returns. Mr. Baldwin's lack of disclosure and delays have not been reasonable and were prejudicial to creditors and the chapter 13 trustee, who have been forced to threaten formal discovery to obtain basic information that should have been promptly and timely disclosed and to respond to multiple plans based on income and assets that remain uncertain (and, in the case of the disability insurance payments, did not exist).

---

[62] 11 U.S.C. 1307(c)(1).
[63] *Ellsworth v. Lifescape Medical Assocs, P.C. (In re Ellsworth)*, 455 B.R. 904, 915 (9th Cir. BAP 2011).
[64] *Ellsworth*, 455 B.R. at 915.

Because there is cause to convert or dismiss, this court next must decide between those options.[65]  In making that decision, the court must consider what is in the best interest of creditors and the estate, and not what is in the best interests of the debtor.[66]

In this case, the best interests of creditors and the estate is to convert the case. Mr. Baldwin has the right to an inheritance that he appears to be either unable or unwilling to actively pursue.  While the precise value of that asset is unknown, this unencumbered, non-exempt asset does appear to have some value.  The creditors would benefit from having a chapter 7 trustee evaluate and pursue that asset.  The creditors may also benefit from having a chapter 7 trustee further evaluate, and perhaps resolve, debtor's unencumbered, non-exempt legal claims.

### Conclusion

For the reasons set forth above, the court denies confirmation of the Second Amended Plan.  The Court will enter an order converting the case to one under chapter 7.

# # #

---

[65] *Jiminez v. ARCP 1, LLC (In re Jimenez)*, 613 B.R. 537, 543 (9th Cir. BAP 2020).
[66] *Brown v. Sobczak (In re Sobczak)*, 369 B.R. 512, 519 (9th Cir. BAP 2007).